UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>              Plaintiff,<br><br>v.<br><br>CARGILL, INC. and SALT CITY, INC.,<br><br>              Defendants. | Case No.<br><br>**COMPLAINT** |

## INTRODUCTION

1.     Cargill, Inc. ("Cargill") and Salt City, Inc. ("Salt City") discharge polluted industrial stormwater from a facility at 163 Union Street, Westfield, Massachusetts (the "Facility"), where they stockpile road salt and transfer it to vehicles for further distribution. Cargill owns all the real property, buildings, fixtures, and machinery located at the Facility, including a salt conveyer system. Salt City operates the Facility. Cargill and Salt City (jointly "Defendants") discharge polluted stormwater from the Facility into the Westfield municipal storm drain system, which flows to Powdermill Brook, a tributary of the Westfield River. Defendants are not controlling these discharges as is required by the federal Clean Water Act. 33 U.S.C. § 1251 *et seq*. (the "Clean Water Act" or "the Act").  Defendants never applied for nor received a federal industrial stormwater discharge permit for these discharges, as is required by the Act.

2.     Defendants store road salt in large piles at the Facility and move it around and off the Facility with heavy equipment and vehicles. Defendants and persons that visit the Facility in the ordinary course of business scatter road salt around the Facility, including on its ground

surface. Rain and snow melt (jointly "stormwater") that lands on and runs over the Facility comes into contact with road salt and mobilizes it. The stormwater then runs down from the Facility into catch basins on Union Street, where it is carried by Westfield's municipal storm drain system to Powdermill Brook, a tributary of the Westfield River.

3.      The area where Westfield's municipal storm sewer system empties into Powdermill Brook is near a potential source of drinking water for Westfield and is just downstream from the city's number two drinking water well.[1] Sodium in drinking water is a health concern for people with hypertension because it can increase blood pressure and cannot be removed by carbon filtration.

4.      Elevated concentrations of salt in fresh water has detrimental effects on the growth, reproduction, and survival of a large range of plants, invertebrates, fish, and amphibians. When salt dissolves, it may disrupt the ability of freshwater organisms to regulate how fluid passes in and out of their bodies.

5.      Animals, including mammals, may be harmed by elevated concentrations of salt in runoff or surface waters that they rely on for hydration. Birds are especially sensitive to salt. Consumption of very small amounts of salt can result in toxicosis and death within the bird population.

6.      The addition of salt to Powdermill Brook has the potential to harm the aquatic environment and aquatic organisms and to alter important species habitat. Powdermill Brook and the Westfield River have been designated by the Commonwealth as Coldwater Fish Resources because fish that require coldwater to survive or reproduce occur in these water bodies or their tributaries. The Facility is less than a mile upstream of designated habitat for state-listed rare

---

[1] Westfield's number 2 drinking water well is currently inactive.

species, known as "Creeper," a freshwater mussel. The Creeper's habitat may be impacted by Cargill's unlawful stormwater discharges.

7. Defendants' discharges of stormwater to Powdermill Brook via the Westfield municipal separate storm drain system are in violation of the Clean Water Act. The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress Defendants' illegal discharges of pollution.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

9. On August 9, 2019, the Commonwealth provided notice of Defendants' violations of the Clean Water Act, and of its intention to file suit against Defendants (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

10. More than sixty days have passed since notice was served.

11. This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

12. The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters, and the related health, safety, economic, recreational, aesthetic, and environmental benefits those waters provide. The interests of the Commonwealth have been, are

being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act, as alleged in this Complaint. The requested relief will redress the harms to the Commonwealth caused by Defendants' activities. Defendants' continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

13. Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## PARTIES

14. Plaintiff is the Commonwealth, appearing by and through the Attorney General.

15. The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under G.L. c. 12, §§ 3 and 11D.

16. Defendant Cargill, Inc. is a corporation organized under the state of Delaware. Cargill owns the Facility. Cargill's principal address is listed as 15407 McGints Road, Wayzata, Minnesota.

17. Defendant Salt City, Inc. is a domestic corporation that operates Cargill's road salt distribution and warehousing facility at the Facility, and that has its principle address listed as 163 Union Street, Westfield.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

18. The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including

the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

19. Stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as salt, sediment, organic matter, nutrients, metals and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people.

20. To minimize polluted stormwater discharges from industrial facilities, EPA has issued a general industrial stormwater permit ("Stormwater Permit") under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, and 2015. *See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 80 Fed. Reg. 34403 (June 4, 2015).

21. Motor freight transportation and warehousing facilities that discharge industrial stormwater to waters of the United States directly or through separate storm sewer systems are subject to the requirements of this Stormwater Permit. Stormwater Permit, Appendix D, pg. D-4.

22. The Stormwater Permit requires these facilities to, among other things:

    a. prepare a stormwater pollution prevention plan ("SWPPP") that, among other things, describes the facility and identifies all stormwater outfalls, Stormwater Permit, pg. 31;

    b. submit to EPA a Notice of Intent ("NOI") to be covered by the Stormwater Permit that lists all stormwater outfalls by a unique 3-digit code and corresponding latitude and longitude coordinates, Stormwater Permit, Appendix G;

c. ensure that pollutant control measures minimize pollutants in stormwater discharges, Stormwater Permit, pg. 14;

d. locate materials, equipment, and activities to contain potential spills, Stormwater Permit, pg. 15;

e. use structural and non-structural control measures to minimize the discharge of sediment, Stormwater Permit, pg. 17;

f. evaluate for and eliminate unauthorized non-stormwater discharges, Stormwater Permit, pg. 19;

g. ensure that stormwater discharges do not cause or have the reasonable potential to cause or contribute to a violation of water quality standards, Stormwater Permit, pg. 20;

h. implement specific best management practices applicable to motor freight transportation and warehousing facilities, Stormwater Permit, pg. 135;

i. include specific SWPPP provisions applicable to motor freight transportation and warehousing facilities, Stormwater Permit, pg. 135-136;

j. conduct corrective action to expeditiously eliminate excessive stormwater pollution and unauthorized non-stormwater discharges, Stormwater Permit, pgs. 27-29;

k. conduct routine facility inspections at least quarterly (Stormwater Permit, pg. 22) and quarterly visual assessments (Stormwater Permit, pg. 24) to, among other things, sample and assess the quality of the facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant

      discharge, and timely perform corrective actions when they are not, Stormwater Permit, pgs. 22-26;

  l. timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions, Stormwater Permit, pgs. 49-50; and

  m. comply with any additional Massachusetts requirements, including but not limited to the requirements of the Massachusetts Clean Waters Act and its implementing regulations. Stormwater Permit, pg. 170.

23. The Stormwater Permit contains specific requirements concerning pollutant controls for salt piles, and requires all permittees to:

  a. enclose or cover storage piles of salt to minimize pollutant discharges, Stormwater Permit, pg. 18;

  b. implement appropriate measures (e.g. good housekeeping, diversions, containment) to minimize exposure resulting from adding to or removing materials from the pile; *id.;* and

  c. document the location of any salt storage piles in the SWPPP. Stormwater Permit, pg. 33.

*Citizen Suit Provision of the Federal Clean Water Act*

24. Section 505(a)(1) of the Act authorizes citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

25. The Commonwealth is a "citizen" within the meaning of Section 505(g) of the Act because it is a "person" having an interest which is or may be adversely affected. *See* 33 U.S.C. § 1365(g).

26. Under Section 505 of the Act, this Court has authority to enjoin Defendants' violations of the Act's prohibition on unauthorized discharges of pollutants and to require the company to comply with its Stormwater Permit. The Court also has authority to impose penalties of up to $53,484 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. § 19.4; 83 Fed. Reg. 1190, 1193 (Jan. 10, 2018).[2]

## STATEMENT OF FACTS

### Description of the Facility & Activities

27. Cargill is reportedly the largest privately held corporation in the United States in terms of revenue. One of the company's business ventures is the sale and distribution of road salt throughout the United States, including in Massachusetts.

28. According to the company's web site, Cargill mines, processes, and transports bulk deicing salt to municipalities, government agencies, and private commercial businesses across the country. Cargill stockpiles road salt at the Facility for further distribution to surrounding communities for winter road de-icing, application, and treatment.

29. Salt City has operated the Facility since at the latest January 2014**.**

30. The Facility consists of approximately 10 acres of exposed impermeable surface. At least one pile of road salt is consistently present at the Facility. The size of the salt pile varies,

---

[2] The statutory maximum civil penalty for violations that occurred on or before November 2, 2015 is $37,500 per day, per violation. 40 CFR § 19.4, Table 1.

depending on season and other factors, but it can be as large as approximately two acres and as high as approximately 40 feet.

## Potential Water Quality Impacts from Road Salt

31.     Sodium chloride (road salt) is composed of sodium ions and chloride ions. Other components and impurities can represent up to 5 percent of the total weight of road salt. The components in road salt are mobilized by rain, melting snow, melting ice and other mechanisms into the environment, including into aquatic ecosystems. The chloride ions in road salt runoff will remain dissolved in the liquid and cannot be treated or filtered with best management practices (such as haybales). Once runoff contaminated with road salt reaches wetlands or streams, the chloride remains in the watershed until it is flushed downstream.

32.     Elevated road salt in fresh water can be toxic to many forms of aquatic life and can harm plants and animals by interfering with their "osmoregulation," the biological process by which they maintain the proper concentration of salt and other solutes in their internal fluids. Difficulties with osmoregulation can inhibit survival, growth, and reproduction and can reduce the diversity of organisms in streams. Aquatic species that may be adversely impacted include plants, fish, macroinvertebrates, insects, and amphibians.

33.     Water contaminated with road salt creates a higher water density and will settle at the deepest part of the water body where water current velocities are low. This can lead to a chemical stratification which depletes dissolved oxygen at the bottom layer of a waterbody, rendering it unsuitable to support aquatic life.

34.     Road salt in the environment affects the health of wildlife, including birds and mammals. Birds are the most sensitive wildlife species to salt, and consumption of even small amounts of salt by birds can result in toxicosis and death within their population. As birds and

other animals drink runoff or surface water contaminated with salt, they may suffer from dehydration, confusion, weakness, and other symptoms.

35. According to a report from the University of Rhode Island, uncovered salt storage piles lose about 20% of their salt each year, much of which finds its way into nearby waterways.[3]

36. The area where Westfield's municipal storm sewer system empties into Powdermill Brook is near a potential source of drinking water for Westfield and is just downstream from the City's number 2 drinking water well (currently inactive). Sodium in drinking water is a health concern for persons with hypertension, because it increases blood pressure.

37. The National Science Foundation has reported that salty, alkaline freshwater can create significant problems for drinking water infrastructure. For example, the well-documented water crisis in Flint, Michigan, occurred when the city switched its primary water source to the Flint River in 2014. The river's high salt load, combined with chemical treatments, made the water corrosive and caused lead to leach from water pipes.[4]

### The Westfield River and its Tributary Powdermill Brook

38. The Westfield River is major tributary of the Connecticut River that drains the eastern slopes of the Berkshire Hills of southwestern Massachusetts, then joins the Connecticut River in Agawam. The Westfield River features native trout fishing, rugged mountain scenery, and a historical mill town settlement. It provides over 50 miles of the Northeast's finest whitewater canoeing and kayaking. It is also home to several threatened and endangered species. The Westfield River and its tributary Powdermill Brook have been designated by the Commonwealth

---

[3] *Chlorides in Fresh Water*, University of Rhode Island, College of the Environment and Life Sciences, Hunt, M., Herron, E. Green, L. (March 2012).

[4] *Winter Road Salt, Fertilizers Turning North American Waterways Increasingly Saltier,* National Science Foundation News Release 18-002 (January 8, 2018), available at https://www.nsf.gov/news/news_summ.jsp?org=NSF&cntn_id=244099&preview=false

as a "Coldwater Fish Resources." Coldwater Fish Resources are particularly sensitive habitats used by reproducing coldwater fish to fulfill one or more of their life stage requirements.

39.     The Commonwealth has designated the area of Powdermill Brook and the Westfield River less than a mile downstream of the Facility as Estimated and Priority Habitat for a state-listed rare species, known as "Creeper," a freshwater mussel. The Creeper's habitat may be impacted by Defendants' stormwater discharges to the Westfield municipal storm drain system, which drains to Powdermill Brook. This same area has been designated by the Commonwealth as "Core Habitat," critical for the long-term persistence of rare species and other species of conservation concern. According to the Massachusetts Department of Fish & Game, protection of Core Habitat "is essential to safeguard the diversity of species and their habitats, intact ecosystems, and resilient natural landscapes across Massachusetts."[5]

40.     The tributary creeks and wetlands within the Westfield River watershed are important in protecting aquatic resources by acting as a natural filtering system for water quality, by preventing downstream flooding, and by providing natural habitats to native species.

## Defendants' Operations

41.     Defendants move road salt around the Facility using heavy equipment and transfer it to vehicles using a conveyor. The road salt is stored in at least one pile, which varies in size depending upon the season and other factors. Portions of the piles are covered with plastic material. Frequently, large portions of the salt piles are uncovered, as depicted in the following aerial photographs found on Google Earth:

---

[5] Massachusetts Department of Fish & Game, Division of Fisheries & Wildlife and The Nature Conservancy, BioMap2: Conserving the Biodiversity of Massachusetts in a Changing World (2010).

11

Date of below aerial imagery, according to Google Earth Pro: 9/2017



Date of below aerial imagery, according to Google Earth Pro: 6/2018



42. Road salt and pollutants that are present in or adhere to it (collectively, "Pollutants") become mobilized by wind, equipment, and vehicles at the Facility and are tracked around and off the Facility by vehicles.

**Defendants' Discharge of Pollutants from the Facility**

*Polluted Stormwater Discharges to the Westfield River*
*via Westfield's Municipal Stormwater System*

43. Road salt at the Facility is exposed to precipitation.

44. Pollutants at the Facility become mobilized by stormwater.

45. Since at least August 1, 2015, during rain and snowmelt events, Defendants have discharged polluted stormwater off the Facility and into Westfield's municipal stormwater system via catch basins on Union Street, including from the following catch basins as depicted on Google Maps "Street View" (images taken by Google in July 2017 and annotated with red arrows by Attorney General's Office):





46.     Pollutants at the Facility adhere to and are tracked off the Facility and on to Union Street by equipment and vehicles (for example, tires and treads). Pollutants from the Facility that are tracked onto Union Street by equipment and vehicles are picked up in stormwater and discharged into catch basins on Union Street and thence to Powdermill Brook.

*Defendants' Failure to Comply
with Federal Stormwater Requirements*

47.     Neither Cargill nor Salt City have submitted any Notice of Intent to be covered by the Stormwater Permit.

48.     Neither Cargill nor Salt City have complied with the terms of the Stormwater Permit.

49.     The companies have failed to:

   a.   prepare a SWPPP for the Facility that, among other things, includes the location of all stormwater outfalls in the SWPPP (violation of section 5.2);

   b.   submit a "complete and accurate NOI" for each Facility (violation of section 1.2.1);

   c.   ensure that pollutant control measures minimize pollutants in its stormwater discharges (violation of section 2.1);

14

    d.    locate materials, equipment, and activities to contain potential spills (violation of section 2.1.2.1);

    e.    use structural and non-structural control measures to minimize the discharge of sediment (violation of section 2.1.2.5);

    f.    evaluate for the presence of and eliminate all non-stormwater discharges at each Facility (violation of section 2.1.2.9);

    g.    ensure that stormwater discharges do not cause or contribute to a violation of water quality standards (violation of section 2.2.1);

    h.    implement specific best management practices applicable to motor freight transportation and warehousing facilities, (violation of section 8.P.3);

    i.    include specific SWPPP provisions applicable to motor freight transportation and warehousing facilities (violation of section 8.P.4);

    j.    enclose or cover storage piles of salt to minimize pollutant discharges (violation of section 2.1.2.7);

    k.    implement appropriate measures (e.g. good housekeeping, diversions, containment) to minimize exposure resulting from adding to or removing materials from the pile (violation of section 2.1.2.7);

    l.    document the location of any salt storage piles in the SWPPP (violation of section 5.2.3.5);

    m.    conduct corrective action to expeditiously eliminate excessive stormwater pollution and unauthorized non-stormwater discharges, (violation of section 4.1);

    n.    conduct routine and quarterly facility inspections to ensure, among other

      things, that control measures are functioning correctly and are adequate to minimize pollutant discharges (violation of sections 3.1 and 3.2);

o.   timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions (violation of section 7.5); and

p.   comply with additional state requirements incorporated by reference into the Permit, including the Massachusetts Clean Waters Act and the Massachusetts Wetlands Protection Act (violation of section 9.1.2.1).

**FIRST CAUSE OF ACTION**
**Discharges of Industrial Stormwater Without a Federal Stormwater Permit:**
**Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

50.     The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

51.     Cargill is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

52.     Salt City is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

53.     Powdermill Brook is a "navigable water" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

54.     Every day since August 1, 2014 to the present that Cargill and/or Salt City discharged polluted stormwater from the Facility to catch basins on Union Street without a Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

55. These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

## SECOND CAUSE OF ACTION

### Noncompliance with the Federal Stormwater Permit:
### Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)

56. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

57. Since at the latest, August 1, 2015, Defendants have violated the Stormwater Permit by failing to implement its requirements, as set forth in paragraph 45, above.

58. Each of Defendants' violations of each of the requirement of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

59. These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

1. Require Cargill and Salt City to obtain coverage under and comply with EPA's federal Stormwater Permit;

2. Order Cargill and Salt City to pay civil penalties of up to $37,500 per day for each violation of the Federal Clean Water Act that occurred on or before November 2, 2015, and civil penalties of up to $53,484 per day for each violation of the Federal Clean Water Act that occurred

after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a), 40 CFR § 19.4, and 83 Fed. Reg. 1190, 1193 (Jan. 10, 2018);

3. Order Cargill and Salt City to take appropriate actions to restore the quality of protected areas impaired by its activities;

4. Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5. Award any such other and further relief as this Court may deem appropriate.

Dated:   August 31, 2020            Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Nora J. Chorover*

Nora J. Chorover (Bar No. 547352) Special Assistant Attorney General Environmental Protection Division Office of the Attorney General One Ashburton Place, 18th Floor Boston, Massachusetts 02108 Tel: (617) 727-2200, ext. 2436
Nora.Chorover@mass.gov